1 | **BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
2 | BRETT M. MIDDLETON (Bar No. 199427)
12481 High Bluff Drive, Suite 300
3 | San Diego, CA 92130
Phone: (858) 793-0070
4 | Fax: (858) 293-0323
brettm@blbglaw.com
5 |
6 | *Attorneys for Plaintiff International Union*
*of Operating Engineers Local 478*
7 | *[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 478, derivatively on behalf of IMPAX LABORATORIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> LARRY HSU, G. FREDERICK WILKINSON, LESLIE Z. BENET, ROBERT L. BURR, ALLEN CHAO, NIGEL T. FLEMING, MICHAEL MARKBREITER, MARY K. PENDERGAST, PETER R. TERRERI, ARTHUR A. KOCH, MICHAEL J. NESTOR, and BRYAN M. REASONS, <br><br> Defendants, <br><br> -and- <br><br> IMPAX LABORATORIES, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................1

II.     JURISDICTION AND VENUE .........................................................4

III.    PARTIES ...............................................................................................5

IV.     FACTUAL BACKGROUND ...............................................................7

      A.      Impax's Business And Operations ............................................7

      B.      FDA Regulation And Oversight ...............................................7

            1.      Forms 483 ......................................................................8

            2.      Warning Letters .............................................................8

      C.      Defendants' Failures To Address Serious cGMP
            Violations At Impax's Manufacturing Facilities ......................9

            1.      The August 2009 Form 483 ..........................................9

            2.      The April 2010 Form 483 ............................................10

            3.      The January 2011 Form 483 ........................................11

            4.      The May 2011 Warning Letter .....................................12

            5.      Defendants Had Actual Knowledge Of May
               2011 Warning  Letter And Underlying
               cGMP Violations At The Hayward Facility .................14

            6.      The March 2012 Form 483 ..........................................17

            7.      The February 2013 Form 483 ......................................18

      D.      Defendants' Failures To Address The Persistent
            Problems Identified By The FDA Caused The FDA
            To Withhold Approval Of Rytary, And
            GlaxoSmithKline To Terminate A Key Agreement
            With Impax ................................................................23

      E.      Defendants' Failures To Ensure cGMP Compliance
            At Impax's Manufacturing Facilities Continue ......................24

            1.      The 2014 Taiwan Form 483..........................................24

            2.      The 2014 Hayward Form 483 .......................................25

      F.      Defendants' Knowledge Of Breaches Of Fiduciary
            Duties Was Highlighted By Prior Lawsuits..............................29

G.      Despite Knowledge Of Serious Regulatory
        Violations, Defendants Allowed Those Violations
        To Recur..................................................................................30

V.      DEFENDANTS' FIDUCIARY DUTIES ..........................................31

VI.     DEMAND ON THE BOARD OF DIRECTORS WOULD
        BE FUTILE................................................................................34

VII.    DEMAND EXCUSED ALLEGATIONS..........................................34

        A.      A Majority Of The Board Faces A Substantial
                Likelihood Of Liability ....................................................34

                1.      All The Current Members Of The Impax
                        Board Had Actual Knowledge Of The
                        Violations ..............................................................34

                2.      Defendant Hsu Had Actual Knowledge Of,
                        And Directly Oversaw, The Violations ....................35

                3.      Seven Director Defendants Who Are
                        Currently Members Of  The Board Have
                        Served Since At Least April 2010 And
                        Breached  Their Duties In Refusing To
                        Engage In Good Faith Oversight  Of The
                        Company's Internal Controls And
                        Compliance Efforts .................................................36

                4.      Four Director Defendants Who Are
                        Currently Members Of The Board Serve On
                        The Compliance Committee ....................................37

        B.      The Board's Misconduct Is Not A Valid Exercise
                Of Business Judgment.......................................................38

VIII.   CLAIMS FOR RELIEF ................................................................39

COUNT I BREACH OF FIDUCIARY DUTY  (Against the
        Director Defendants)..................................................................39

COUNT II BREACH OF FIDUCIARY DUTY  (Against the
        Officer Defendants) ...................................................................40

IX.     PRAYER FOR RELIEF ................................................................40

X.      JURY DEMAND ........................................................................41

Plaintiff International Union of Operating Engineers Local 478 ("IUOE 478" or "Plaintiff"), by and through its undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Impax Laboratories, Inc. ("Impax" or the "Company") against the members of its board of directors (the "Board") and certain of its present and former executive officers, seeking to remedy Defendants' breaches of fiduciary duties, and other misconduct. The allegations in the Complaint are made upon Plaintiff's personal knowledge with regard to its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, among other things, the investigation conducted by Plaintiff's counsel. That investigation included, among other things, the review of Impax's filings with the U.S. Securities and Exchange Commission ("SEC"), the review of publicly available correspondence between the U.S. Food and Drug Administration ("FDA") and Impax, and the review of news articles, analysts' reports, and other publicly available information.

## I.  INTRODUCTION

1.  It is of the utmost importance that pharmaceutical drugs that are manufactured, distributed, and prescribed to patients meet the highest standards of quality, and are of consistent potency. From the consumer and public health perspectives, drug quality and consistent potency are necessary to ensure that individuals who are prescribed pharmaceuticals receive the correct amount of the prescribed therapeutic drugs to treat the individuals' medical conditions, and not either too little (so they would fail to receive adequate doses of the required medicine) or too much (which could cause unnecessary, or unanticipated risk of, harm).

2.  For companies that produce pharmaceuticals, ensuring such quality and consistency at every step of the manufacturing process is crucial as well. A company responsible for producing or distributing adulterated or harmful drugs, or drugs of inconsistent potency, to consumers faces significant liability, regulatory action by the FDA, and negative reactions from consumers, business partners, and investors, which may materially harm the company. As a manufacturer of prescription pharmaceuticals, Impax has an imperative to comply with all applicable laws and regulatory requirements to ensure drug safety and quality. Moreover,

1    Impax's directors and senior officers have a fiduciary obligation to ensure such compliance.

2          3.      The FDA, in order to regulate companies like Impax that develop and

3    manufacture prescription drugs, regularly inspects manufacturing facilities to investigate whether

4    regulated companies are in compliance with the agency's current Good Manufacturing Practice

5    ("cGMP") regulations.    cGMP regulations constitute minimum requirements that a

6    pharmaceutical manufacturer must meet to assure that products are of high quality and do not

7    pose undue risk to consumers or the public.  If FDA inspectors observe cGMP violations, the

8    FDA at the end of the inspection will issue a "Form 483" to the company, delivered to senior

9    management, detailing observed violations.

10         4.      When a company receives a Form 483, it should then address any and all cGMP

11   violations indicated, or else run the risk of further, more serious regulatory action, including an

12   FDA Warning Letter, the rejection of drug applications, or other significant consequences.  Here,

13   however, Impax did no such thing.  Instead, Impax has received Forms 483 for serious cGMP

14   violations at its manufacturing facility in Hayward, California (the "Hayward facility") each year

15   since 2009, punctuated by a Warning Letter in 2011 (the "May 2011 Warning Letter") and

16   followed by Forms 483 in 2012, 2013, and 2014.  Those Forms 483 and the May 2011 Warning

17   Letter document significant, recurring problems, including without limitation, failure to identify

18   or correct root causes of unexplained discrepancies in drug manufacture quality and potency,

19   failures to properly maintain key pieces of equipment, metal contaminants in drug samples,

20   failures to store raw materials properly, failures to adequately sanitize manufacturing equipment,

21   and unreliable drug testing processes.

22         5.      Despite the numerous Forms 483 and the May 2011 Warning Letter, the

23   Defendant members of the Board and Impax's senior management, who knew of the underlying

24   recurring legal and regulatory violations, disregarded their obligations and the consequences of

25   continued violations and allowed those violations to fester.  Although Defendants had every

26   opportunity to adequately address the significant violations that the FDA identified year after

27   year, they refused to do so.  Indeed, despite Defendants' reassuring shareholders that the

28   Company was addressing the issues identified by the FDA in response, for instance, to the

FDA's May 2011 Warning Letter and subsequent Forms 483, the problems at Impax's manufacturing facility continued unabated.  Indeed, the violations cited in the May 2011 Warning Letter remain open and unresolved to this date.

6.     Impax manufactures both proprietary and generic drugs, and currently has one internally developed late-stage branded pharmaceutical product candidate, Rytary, which is an extended release capsule formulation of carbidopa-levodopa for the symptomatic treatment of Parkinson's disease.  On January 21, 2013, the Company was forced to announce that, due to the recurring cGMP violations at the Company and Impax's failure to adequately address the violations identified in the FDA's May 2011 Warning Letter, the FDA did not approve Impax's new drug application ("NDA") to manufacture Rytary.

7.     In addition, as a result of Impax's regulatory problems, commercial partner GlaxoSmithKline ("GSK") withdrew from an agreement with the Company to develop and commercialize Rytary globally, leaving Impax searching for new partners to help develop and sell the drug in key markets.

8.     Further, in 2013, the significant violations at Impax's Hayward facility gave rise to federal securities class actions against the Company and two officers, one of whom is also a director, wherein plaintiffs alleged that those defendants failed to disclose the true nature of the Company's persistent problems and further misrepresented the scope, nature, and efficacy of remediation efforts.  The Court substantially denied the defendants' motion to dismiss, concluding that the complaint properly alleged false statements and scienter.  Defendants quickly settled that case.

9.     Although the Company had received numerous Forms 483 – both before and after the May 2011 Warning Letter, failed to have Rytary approved, lost the important contract with GSK, and faced significant liability in the securities class action described above, Defendants failed to take adequate corrective actions.  As a result, in July 2014, the FDA issued a Form 483 regarding cGMP violations at the Company's manufacturing facility in Taiwan (the "Taiwan facility") – where the Company planned to manufacture Rytary instead of at the Hayward facility – and yet another Form 483 regarding cGMP violations at the Hayward facility, within days of

each other.  Both July 2014 Forms 483 included observations of flagrant violations consistent with the violations that the FDA had previously observed.

10.     Due to Defendants' failures to correct the legal and regulatory violations that have plagued the Company's manufacturing facilities for more than five years, the FDA has delayed for *years* the approval of the Company's key drug, Rytary; and the Company has lost its important commercial partner, GSK; lost commercial opportunities; lost sales; and has been unnecessarily and improperly exposed to significant risk and harm, including further regulatory action, civil liability, and negative reactions from consumers and investors.  Impax has suffered and continues to suffer substantial harm directly flowing from Defendants' breaches of fiduciary duty, which this action seeks to redress.

## II.     JURISDICTION AND VENUE

11.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     This action is not brought collusively to confer jurisdiction on this Court that it would not otherwise have.

13.     Venue is proper in this district under 28 U.S.C. §§ 1391 and 1401 because Impax's headquarters is in this district and a substantial portion of the transactions and wrongs complained of herein – including Defendants' breaches of fiduciary duty – occurred in this district.  Moreover, each Defendant has received substantial compensation in this district by engaging in numerous activities that had an effect in this district.

14.     Each Defendant has minimum contacts with the Northern District of California as each has entered into contracts in the Northern District of California, or has frequently traveled to the Northern District of California, including on Impax business, or has authorized acts and actions that have had a sufficient impact in the Northern District of California, including on Impax and on Impax investors residing in this district, to justify the Court's exercise of jurisdiction.

1  III.   **PARTIES**

2       15.    Plaintiff IUOE 478 is a current shareholder of the Company, has been

3  continuously since at least September 10, 2012, and intends to hold Impax shares at least through

4  the resolution of this action.   IUOE 478 is a labor union comprising trained, qualified, heavy

5  equipment operators, mechanics, and support personnel in Connecticut, and offers its members

6  retirement benefits through (among other programs) its Pension Plan and Annuity Fund.   For

7  purposes of diversity jurisdiction, IUOE 478 is a citizen of Connecticut.

8       16.    Nominal Defendant Impax is a technology-based specialty pharmaceutical

9  company engaged in the development and manufacture of both proprietary and generic

10 prescription drugs.   Impax is incorporated in Delaware and has its principal place of business at

11 30831 Huntwood Avenue, Hayward, California 94544.   Shares of Impax common stock are

12 traded on the NASDAQ Global Select Market under the ticker symbol "IPXL."

13      17.    Defendant Larry Hsu ("Hsu") has served as a director of Impax since 1999.

14 Moreover, from October 2006 through April 2014, Hsu served as the Company's President and

15 Chief Executive Officer ("CEO").   Hsu co-founded Impax's predecessor Impax Pharmaceuticals,

16 Inc. – which now operates as the Company's division developing and manufacturing proprietary

17 branded pharmaceuticals (discussed below) – in 1994 and served as its President, Chief

18 Operating Officer ("COO") and a director until it merged with Impax in 1999.   Between 1999

19 and October 2006, Hsu served as the Company's President and COO.   Hsu is a citizen of

20 California.

21      18.    Defendant G. Frederick Wilkinson ("Wilkinson") has served as a director of

22 Impax since May 2014, and has served as the Company's President and CEO since April 2014.

23 Wilkinson is a citizen of New Jersey.

24      19.    Defendant Leslie Z. Benet ("Benet") has served as a director of Impax since 2001.

25 Benet has served as a member of Impax's Compliance Committee since its inception in May

26 2013, and a member of the Nominating and Compensation Committees since April 2009.   Benet

27 is a citizen of California.

28      20.    Defendant Robert L. Burr ("Burr") has served as a director of the Company since

2001, and as Chairman of the Impax Board since December 2008.  Burr has served as Chairman of the Compensation Committee, and as a member of the Audit and Nominating Committees since April 2009.  Burr is a citizen of South Carolina.

21.     Defendant Allen Chao ("Chao") has served as a director of Impax since April 8, 2010, and has served as a member of the Compliance Committee since its inception in May 2013 and a member of the Audit Committee since April 2011.  Chao is a citizen of California.

22.     Defendant Nigel T. Fleming ("Fleming") has served as a director of Impax since 1999, and has served as Chairman of the Nominating Committee and a member of the Compensation Committee since April 2009.  Fleming is a citizen of California.

23.     Defendant Michael Markbreiter ("Markbreiter") has served as a director of Impax since 1997, and as a member of the Audit Committee since April 2009.  Markbreiter is a citizen of New York.

24.     Defendant Mary K. Pendergast ("Pendergast") has served as a director of Impax since July 2013, and has served as a member of the Compliance Committee since July 2013.  Pendergast is a citizen of the District of Columbia.

25.     Defendant Peter R. Terreri ("Terreri") has served as a director of Impax since 2003, has served as a member of the Compliance Committee since its inception in May 2013, and as Chairman of the Audit Committee since April 2009.  Terreri is a citizen of Pennsylvania.

26.     Defendant Arthur A. Koch ("Koch") served as the Company's Chief Financial Officer ("CFO") from February 2004 until June 2012.  Koch is a citizen of Pennsylvania.

27.     Defendant Michael J. Nestor ("Nestor") has served as President of Impax's branded products division, Impax Pharmaceuticals (the "Impax Division"), since March 2008.  Nestor is a citizen of California.

28.     Defendant Bryan M. Reasons ("Reasons") has served as Impax's CFO and Senior Vice President, Finance since December 2012.  Prior to that, Reasons served as Impax's Acting CFO from June 2012 to December 2012, and as the Company's Vice President, Finance from January 2012 to June 2012.  Reasons is a citizen of California.

29.     Defendants Hsu, Wilkinson, Benet, Burr, Chao, Fleming, Markbreiter,

1  Pendergast, and Terreri are collectively referred to herein as the "Director Defendants."

2  30.  Defendants Hsu, Wilkinson, Koch, Nestor, and Reasons are collectively referred

3  to herein as the "Officer Defendants."

4  **IV.  FACTUAL BACKGROUND**

5  **A.  Impax's Business And Operations**

6  31.  Impax describes itself in its SEC filings as "a technology-based, specialty

7  pharmaceutical company [that] has two reportable segments, referred to as the 'Global

8  Pharmaceuticals Division' ('Global Division') and the 'Impax Pharmaceuticals Division'

9  ('Impax Division')."  The Global Division "develops, manufactures, sells, and distributes generic

10  pharmaceutical products," while the Impax Division "is engaged in the development of

11  proprietary brand pharmaceutical products that the Company believes represent improvements to

12  already-approved pharmaceutical products addressing central nervous system ('CNS')

13  disorders."

14  32.  Impax operates two manufacturing facilities: the Hayward facility in Hayward,

15  California, and the Taiwan facility in Taiwan, Republic of China.

16  33.  Presently, Impax (through the Impax Division, overseen by Defendant Nestor) has

17  one internally developed late-stage branded pharmaceutical product candidate, Rytary, an

18  extended release capsule formulation of carbidopa-levodopa for the symptomatic treatment of

19  Parkinson's disease.

20  **B.  FDA Regulation And Oversight**

21  34.  The FDA, as part of the U.S. Department of Health and Human Services, is

22  responsible for (among other things) assuring the safety, effectiveness, and quality of drugs,

23  vaccines and other biological products, and medical devices.  Under Section 704 of the Federal

24  Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 374, the FDA is authorized and required

25  to perform inspections of manufacturing and production facilities, such as the Hayward facility

26  and the Taiwan facility, in order to ensure legal compliance and that drugs are produced in

27  compliance with the FDA's current Good Manufacturing Practice regulations.  Those regulations

28  provide minimum requirements that a pharmaceutical manufacturer must meet to assure that

1  products are of high quality and do not pose any risk to consumers or the public.

2      35.  Critically, according to the FDA's website, "[f]ailure to comply [with cGMP

3  regulations] can . . . lead to a decision by [the] FDA not to approve an application to market a

4  drug," because the "FDA cannot approve applications to market new drugs from companies who

5  have been cited for [cGMP] violations."

6                          1.    **Forms 483**

7      36.  At the conclusion of the FDA's inspection of a facility, if the FDA has observed

8  any conditions that may constitute violations of the law or of cGMP regulations, the FDA issues

9  a Form 483 "Notice of Observations" to company management.  As the FDA's website describes

10  it, "each observation noted on the FDA Form 483 is clear, specific and significant," and

11  "[o]bservations are made when in the investigator's judgement, conditions or practices observed

12  would indicate that any food, drug, device or cosmetic has been adulterated or is being prepared,

13  packed, or held under conditions whereby it may become adulterated or rendered injurious to

14  health."

15      37.  Further, the Form 483 "notifies the company's management of objectionable

16  conditions," and "[a]t the conclusion of an inspection, the FDA Form 483 is presented and

17  discussed with the company's senior management."  "Each observation is read and discussed so

18  that there is a full understanding of what the observations are and what they mean," and

19  "[c]ompanies are encouraged to respond to the FDA Form 483 in writing with their corrective

20  action plan and then implement that corrective action plan expeditiously."

21      38.  Forms 483 include FDA inspectors' "Observations" of objectionable conditions at

22  a facility.  A company's failure to adequately address inspectors' concerns recorded in a Form

23  483 may result in negative consequences, including issuance of a Warning Letter from the FDA,

24  withholding of product approval, or shutting down a facility.

25                          2.    **Warning Letters**

26      39.  If, after receiving a Form 483, the company fails to adequately address the FDA's

27  observations of violations of the law and/or cGMP regulations, the FDA may send the company

28  a Warning Letter.  The FDA's Regulatory Procedures Manual defines a Warning Letter as:

a correspondence that notifies regulated industry about violations that FDA has documented during its inspections or investigations. Typically, a Warning Letter notifies a responsible individual or firm that the Agency considers one or more products, practices, processes, or other activities to be in violation of the Federal Food, Drug, and Cosmetic Act (the Act), its implementing regulations and other federal statutes. Warning Letters should only be issued for violations of regulatory significance, i.e., those that may actually lead to an enforcement action if the documented violations are not promptly and adequately corrected. A Warning Letter is one of the Agency's principal means of achieving prompt voluntary compliance with the Act.

40.     It is rare for the FDA to issue Warning Letters, and the agency does so only in serious cases. In 2011, when the FDA conducted 1,512 domestic inspections, it issued only 52 Warning Letters. In 2012, when the FDA conducted 1,447 inspections, it issued only 40 Warning Letters.

## C.     Defendants' Failures To Address Serious cGMP Violations At Impax's Manufacturing Facilities

41.     From 2009 to the present, the FDA has repeatedly cited Impax, through both Forms 483 and a Warning Letter, for significant cGMP violations. Indeed, the FDA has sent the Company's senior management, including Defendant Hsu, Forms 483 each year since 2009, frequently including "Repeat Observations" of improper conditions that the Company had failed to remedy despite repeated warnings. There can be no genuine question that Hsu and the other Defendants had actual knowledge of the problems that the FDA identified, or that Defendants permitted those problems to fester, unaddressed, ultimately threatening and causing significant harm to the Company.

### 1.     The August 2009 Form 483

42.     Between July 27 and August 7, 2009, the FDA performed an inspection of the Hayward facility. After that inspection revealed cGMP violations, on August 7, 2009, the FDA issued Impax a Form 483 (the "August 2009 Form 483"), addressed to Vice President of Regulatory Affairs & Compliance Mark C. Shaw ("Shaw"), which identified four Observations. Those Observations were:

   a. ***"Quality System."*** In the August Form 483, the FDA indicated that the Company had failed to adequately investigate "possible root cause[s] related to [the] integrity of" the coating of capsules, and also that Impax had failed to follow certain standard operating procedures regarding "Personnel Training."

b. ***"Facilities & Equipment."*** The FDA informed the Company that "[c]leaning validation for non-dedicated equipment is deficient" due to a lack of documentation of certain cleaning practices, deficient standard operating procedures for cleaning processing equipment, and the failure to calibrate key measuring devices. Moreover, the FDA discussed Impax's failures to properly dry "filter bags" used for various commercial products such that "[t]he firm represented the worst case scenario" at certain settings, as well as the failure to evaluate and ensure proper performance at other settings. The FDA also wrote that Impax failed to complete "[t]emperature and relative humidity mapping" for key areas used to store raw materials.

c. ***"Laboratory Systems."*** The FDA observed that, concerning the stability of certain drugs, Impax had engaged in "deficient" retesting that "lack[ed] documentation in the raw data notebook" that retesting was actually performed on samples that had previously failed, as opposed to "mixed" – and therefore unreliable – samples. The FDA also observed the Company's failure to calibrate weight measurements against a national standard.

d. ***"Production Systems."*** Lastly, in the August 2009 Form 483, the FDA observed that during compression of certain tablets, "product powder was flowing in a steady st[r]eam onto a plastic dish outside of the plastic enclosure of the equipment," yet "[o]perators did not stop the press to investigate the problem or issue a work order until questioned by FDA."

## 2. The April 2010 Form 483

43. Despite the serious failures that the FDA identified and warned the Company about in the August 2009 Form 483, Defendants failed to adequately address those problems, and caused the FDA to issue another Form 483 just months later. After an inspection of the Hayward facility from April 7 to April 22, 2010, the FDA issued a Form 483 (the "April 2010 Form 483"), addressed to Shaw, setting forth Observations of *seven* failures in need of corrective action. Specifically, the FDA observed that:

a. ***"Procedures designed to prevent objectionable microorganisms in drug products not required to be sterile are not established,"*** and warned that "there is no scientific data to evaluate the effectiveness of the established cleaning procedures and environmental/personal controls in preventing microbiological contamination of drug product";

b. ***"Written procedures are not established for the cleaning and maintenance of equipment,*** including utensils, used in the manufacture, processing, packing or holding of a drug product," and that "there is no scientific justification for the . . . 'dirty hold times' for processing equipment," an analysis that "applies to all commercial processing equipment and all drug products" in the building at issue;

c. ***"Procedures for the cleaning and maintenance of equipment are deficient regarding the protection of clean equipment from contamination prior to use";***

d. ***"Written procedures for cleaning and maintenance fail to include description in sufficient detail of methods, equipment, and materials used,"*** as well as that the Company improperly scrubbed key pieces of equipment, and did not follow

scrubbing procedures "required to achieve visual cleanliness following production";

e. ***"The sensitivity and specificity of test methods have not been established,"*** such that test methods did not adequately evaluate the effects of certain cleaning compounds which would lead to unreliable testing results, the facility's "analytical balance [wa]s not verified under actual conditions of use," and there were not procedures in place to ensure "balance accuracy in order to evaluate the balance suitability and sensitivity";

f. ***"There is a failure to thoroughly review any unexplained discrepancy whether or not the batch has already been distributed,"*** including that "the investigation into the identification of an *increased trend in metal contamination* and the proposed corrective action does not ensure that the equipment used in manufacturing is properly maintained in order to *prevent the adulteration of drug product*." Because the Company's proposed corrective action did not "address the root cause (equipment wear) identified in the associated investigation report . . . in an attempt to mitigate the 'baseline' metal contamination," "[t]he source of the metal particle [could not] be definitively identified"; and

g. ***"The master production and control records are deficient in that they do not include complete manufacturing, control, and procedures."***

### 3. The January 2011 Form 483

44. Despite the FDA's serious observations of cGMP compliance failures set forth in the August 2009 and April 2010 Forms 483, Defendants still failed to adequately address the persistent violations at the Hayward facility. Following a lengthy inspection from December 13, 2010 to January 21, 2011, the FDA issued a Form 483 addressed to Defendant Hsu on January 21, 2011 (the "January 2011 Form 483") that set forth five Observations, including one specifically identified "Repeat Observation From Inspection Dated 4/7-22/2010." The FDA observed that:

a. ***"There is a failure to thoroughly review any unexplained discrepancy whether or not the batch has already been distributed."*** As indicated above, this Observation was a "Repeat Observation" from the April 2010 Form 483. The FDA observed that, although after the April 2010 Form 483 the Company represented that it had taken "corrective and preventative actions to address and mitigate the root cause of the baseline metal contamination" previously identified, those "corrective and preventative actions are ineffective in that the occurrence of metal contamination exists for finished drug product tablets after implementation." The FDA further observed that despite approximately 130 complaints between August 2009 and December 2010 regarding the presence of "vinegar," "citrus," and "pungent" odors in the Company's drug products, the Company failed to "determine[] a probable root cause for why drug product lots contain or do not contain the described odor." Moreover, the January 2011 Form 483 discussed Impax's failure to identify root causes or otherwise take adequate corrective action regarding (i) "black specks" found in drug tablets, (ii) drug

capsules of inexplicably varying weights, and (iii) the failure to evaluate the quality impact resulting from the use of different raw materials in certain drugs;

b. ***"Control procedures are not established which validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product."*** Specifically, the FDA observed that the Company "lacks documented evidence for the established upper and lower limits of validated process ranges performed at commercial-scale" and "provides no assurance to support the process ranges allowed." Further, the FDA observed the Company's *failure to identify the root cause of metal contamination* in drug tablets, compounded by the Company's use of metal-contaminated tablets to generate key data for the Company. In addition, Impax failed to adequately account for the effects of certain manufacturing "process changes," which were "responsible for causing batch variability," and also produced commercial batches of certain drugs in a higher strength than previously despite rejection of a higher-strength batch "due to Quality issues";

c. ***"Equipment and utensils are not maintained at appropriate intervals to prevent malfunctions and contamination that would alter the safety, identity, strength, quality or purity of the drug product."*** The FDA observed that Impax's "tablet compression equipment" suffered from liquid droplets and "chipping paint" that caused an unacceptable risk of malfunction and contamination;

d. ***"Written production and process control procedures are not followed in the execution of production and process control functions and documented at the time of performance."*** The FDA observed that rather than creating critical batch records contemporaneously so as to maintain effective controls over drug manufacture, Impax used photocopied forms, including "pre-filled information." The Company also had discarded certain sampling results that should have been used to verify testing results of certain drug samples that had previously "failed the acceptance criteria." The discarded results should have been recorded, but were not; and

e. "***Written procedures are not established and followed for evaluations conducted at least annually to review records associated with a representative number of batches, whether approved or rejected."*** Lastly, the January 2011 Form 483 contained the Observation that Impax lacked a "scientific rationale" that the Company employed "a suitable statistical tool to provide a representative sample for drug product evaluation" during Impax's annual product review.

45. Further, during the course of the FDA's 2010-2011 inspection of the Hayward facility, an FDA investigator gave Impax management a "verbal warning" for misleading the inspection team, apparently due to knowingly and falsely referring to serious metal contamination of certain drugs as merely "grey particulates."

### 4. The May 2011 Warning Letter

46. After Defendants again failed to remedy the persistent problems that the FDA had repeatedly identified at the Hayward facility, the FDA sent Impax a Warning Letter on May 31, 2011 (the "May 2011 Warning Letter"), addressed to Defendant Hsu, regarding cGMP violations

that "cause[d] [Impax's] drug product(s) to be adulterated within the meaning of . . . the Federal

Food, Drug, and Cosmetic Act . . . in that the methods used in, or the facilities or controls used

for, their manufacture, processing, packing, or holding do not conform to, or are not operated or

administered in conformity with, cGMP."

47.    The May 2011 Warning Letter noted that the Company's response to the January

2011 Form 483 "lack[ed] sufficient corrective actions."   The letter went on to detail specific

violations that Defendants had failed to remedy, including:

a.    Impax "has not established written procedures to monitor the output and to
validate the performance of those manufacturing processes that may be
responsible for causing variability in the characteristics of in process material and
drug product";

b.    Impax manufactured and distributed drug lots "although the process" was not
validated, which resulted in "weight variations";

c.    Impax failed to specify steps that the Company was taking to investigate the root
causes of drug containing capsules of varying weights;

d.    Impax "d[id] not have data to support the temperature range" used during certain
drug production processes, and the Company's "process validation study d[id] not
provide any data to support the process range allowed in the Master Batch
Records"; and

e.    Repeated from the FDA's April 2010 inspection, Impax failed, on more than one
occasion, to "thoroughly investigate[] the failure of a batch or any of its
components to meet its specifications, whether or not the batch has already been
distributed, or extended investigations to other batches of drug product that may
have been associated with the specific failure or discrepancy."   The FDA warned
that although "our investigators identified up to 75% of the manufactured lots of
various drug products having one or more metal-contaminated tablets," the
Company's investigations "were inadequate in their scope because your firm
failed to evaluate all possible sources of metal contamination" and the Company
performed only "surface inspections" that would reveal contamination only "on
the exterior of the tablet," thereby "limit[ing] [Impax's] ability to determine a root
cause."

48.    The strong language in the May 2011 Warning Letter left little question that

serious cGMP violations persisted at the Hayward facility and that Defendants were required to

act to correct those problems quickly.   Indeed, the FDA noted that "[t]he violations cited in this

letter are not intended to be an all-inclusive statement of violations that exist at your facility,"

and instructed Defendants to "take prompt action to correct the violations cited," including

"investigating and determining the causes of the violations" identified therein and "preventing

their recurrence and the occurrence of other violations."

49.     The FDA concluded the May 2011 Warning Letter by informing Defendants that "[f]ailure to promptly correct these violations may result in legal action without further notice including, without limitation, seizure and injunction," the loss of contracts with federal agencies, and the FDA's withholding approval of pending drug applications.

### 5.     Defendants Had Actual Knowledge Of May 2011 Warning Letter And Underlying cGMP Violations At The Hayward Facility

50.     By Defendants' own admissions, as contained in SEC filings, Defendants were not only on notice but had actual knowledge of the May 2011 Warning Letter and the underlying cGMP violations at the Hayward facility reflected therein.  On June 6, 2011, Impax filed a Form 8-K with the SEC, which included a press release describing the receipt of the May 2011 Warning Letter.  The Form 8-K was signed by Defendant Koch, and the press release quotes Defendant Hsu.

51.     Similarly, on August 4, 2011, Impax filed a quarterly report on Form 10-Q with the SEC.  The Form 10-Q discussed the May 2011 Warning Letter, and the potential impact on Impax, including as follows:

> In June 2011, we received a warning letter from the U.S. Food and Drug Administration (FDA) related to an on-site FDA inspection of our Hayward, California manufacturing facility conducted between December 13, 2010 and January 21, 2011.  In the warning letter, the FDA cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing processes, stability testing, record keeping and quality standards.  In summary, the FDA observations related to sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications.
>
> *    *    *
>
> Unless and until our corrective action is completed to the FDA's satisfaction, it is possible we may be subject to additional regulatory action by the FDA as a result of the current or future FDA observations.  Additionally, the FDA may withhold approval of pending drug applications listing our Hayward, California facility as a manufacturing location of finished dosage forms until the FDA observations are resolved.  If we are unable to promptly correct the issues raised in the warning letter, our business, consolidated results of operations and consolidated financial condition could be materially adversely affected.  See "Risk Factors – *We have received a warning letter from the FDA. If we are unable to promptly correct the issues raised in the warning letter, our business, consolidated results of*

*operations and consolidated financial condition could be materially adversely affected.*"

52.     The Form 10-Q was signed by Defendants Hsu and Koch.  Additionally, both the Board as a whole and the Audit Committee had responsibility for oversight of enterprise risk. For example, Impax's proxy statement for 2012 states in relevant part as follows:

**Board's Role in Risk Oversight**

We are exposed to a number of risks and undertake at least annually an enterprise risk management review to identify and evaluate these risks and to develop plans to manage them effectively.  It is management's responsibility to manage risk and bring the material risks applicable to the company to the board's attention.  The board has oversight responsibility of the processes established to report and monitor these risks.  On behalf of the board, the audit committee plays a key role in the oversight of our enterprise risk management function.  Mr. Koch, our Chief Financial Officer, is directly responsible for our enterprise risk management function and reports both to the President and Chief Executive Officer and to the audit committee in this capacity.    In fulfilling his risk-management responsibilities, Mr. Koch works closely with members of our senior management and meets with the audit committee at least four times a year to discuss the risks facing our company, highlighting any new risks that may have arisen since the committee last met.  The audit committee also reports to the board on a regular basis to apprise them of their discussions with Mr. Koch regarding our enterprise risk management efforts.  Finally, Mr. Koch reports directly to the board on at least an annual basis to apprise it directly of our enterprise risk management efforts. . . .

53.     During this period of time, Defendants Burr, Chao, Markbreiter, and Terreri were members of the Audit Committee and Defendants Hsu, Benet, and Fleming were also members of the Board.

54.     Additionally, Impax's 2012 Annual Report, filed with the SEC on a Form 10-K on February 26, 2013, evidences the Board's knowledge of Impax's SEC regulatory actions and the recurring cGMP violations.  In the 2012 Annual Report, the Company states in relevant part:

In late May 2011, we received a warning letter from the FDA related to an on-site FDA inspection of our Hayward, California manufacturing facility conducted between December 13, 2010 and January 21, 2011.  In the warning letter, the FDA cited deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing processes, stability testing, record keeping and quality standards.  In summary, the FDA observations set forth in the warning letter related to sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications.  From late June 2011 through the end of 2011, we filed our response and subsequent updates with the FDA and continued to cooperate with the FDA to resolve the FDA observations.  During the quarter ended March 31,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                                    -15-
Case No.

2012, the FDA completed a re-inspection of our Hayward manufacturing facility in connection with the warning letter and in addition, a general GMP inspection. As a result of the general GMP inspection of our Hayward operations, the FDA issued a Form 483, with observations primarily relating to our Quality Control Laboratory. We have been notified by the FDA that a satisfactory re-inspection of our Hayward manufacturing facility is required to close out the warning letter.

* * *

Additionally, the FDA has withheld and may continue to withhold approval of pending drug applications currently or previously listing our Hayward, California facility as a manufacturing location of finished dosage forms until these FDA observations are resolved. For instance, in January 2013, the FDA issued a Complete Response Letter regarding our NDA for our late stage branded pharmaceutical product candidate, RYTARY™, which we are developing internally, for the symptomatic treatment of Parkinson's disease. In the Complete Response Letter, the FDA indicated that it required a satisfactory re-inspection of our Hayward manufacturing facility as a result of the warning letter issued to us in May 2011 before the NDA may be approved by the FDA due to the facility's involvement in the development of RYTARY™ and supportive manufacturing and distribution activities. During the assessment of the NDA, we had withdrawn the Hayward site as an alternative site of commercial production in the launch of RYTARY™. We are currently working with the FDA on the appropriate next steps for the RYTARY™ NDA and, as noted above, on closing out the warning letter, however we cannot be assured of when that will occur.

55. The 2012 Annual Report was signed by Defendants Hsu, Reasons, Burr, Benet, Chao, Fleming, Markbreiter, and Terreri.

56. In addition to their knowledge of the serious regulatory problems set forth in the Forms 483 and the May 2011 Warning Letter, Defendants repeatedly made and caused to be made several false representations that the Company was implementing corrective measures to adequately address cGMP violations identified by the FDA.

57. On an August 2, 2011 conference call discussing the Company's quarterly earnings, Defendant Hsu publicly stated that "[w]e hope to be able to close out the warning letter in the next six to eight months." Also on August 2, 2011, the Company issued a press release stating that "[w]e have already made significant manufacturing and quality control systems improvements and believe we have addressed a number of the FDA's observations."

58. In actuality, however, as detailed below, more than three years later, the recurring violations at the Hayward facility continue unabated, and the issues in the May 2011 Warning Letter remain open and unresolved, which has caused serious harm to Impax.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    -16-
Case No.

### 6. The March 2012 Form 483

59.    Despite Defendants' knowledge of serious cGMP violations and regulatory scrutiny, Defendants still failed to take adequate corrective measures to address the repeated significant cGMP violations that the FDA had identified in the May 2011 Warning Letter, as well as the August 2009, April 2010, and January 2011 Forms 483.  Between February 23 and March 28, 2012, the FDA performed yet another inspection of the Hawyard facility.   That inspection again resulted in a Form 483, which the FDA issued to Defendant Hsu on March 28, 2012 (the "March 2012 Form 483").

60.    The March 2012 Form 483 set forth five Observations, several of which echoed past cGMP violations and failures that the FDA had identified.  Specifically, the FDA observed:

a.    *"Drug products failing to meet established standards and specifications are not rejected."*   The FDA noted, among other things, that in multiple instances there was "no documentation and/or investigation to provide assurance that 'trial' and 'official' samples were performed using the same sample/lot under analysis," meaning that there were not reliable controls in place to ensure that drugs consistently met pertinent standards and that prior shortcomings had been adequately addressed;

b.    *"Investigations of a failure of a batch or any of its components to meet any of its specifications did not extend to other batches of the same drug product."* The FDA observed that, despite specific drug batches having failed certain testing, there was no evidence that the Company had properly tested other batches of those drugs to evaluate the prior test failures and ensure that underlying problems were addressed;

c.    *"Written procedures for sampling and testing plans are not followed for each drug product."*   The FDA observed that key drug testing was not conducted in accordance with standard operating procedures, such that the Company could not properly analyze "suspect out of trend results" for specific drugs;

d.    *"Written production and process control procedures are not followed in the execution of production and process control functions."*   The FDA observed that hoses containing "unknown product residue buildup" that should have been removed from a manufacturing room were, instead, stored in the room in an open plastic bag, and also that other tools with "unknown powdered residue" were stored in plastic bags suggesting that they had been "major cleaned."  In addition, the FDA observed that "[e]quipment failures requiring non-routine maintenance," such as water inside an electrical cabinet, incidents of powder residue, and "hydraulic fluctuation during equipment set-up operations," were "not always investigated"; and

e.    *"Written records are not made of investigations into unexplained discrepancies and the failure of a batch or any of its components to meet specifications."*   The FDA observed that, "[s]pecifically, [t]here is a failure to document and investigate unexplained discrepancies that arise during the course of manufacturing and [quality control] analytical testing," including that (i) "[u]nofficial and

undocumented investigations are performed to evaluate suspect [quality control] data, including but not limited to . . . [a]nalytical method accuracy and reliability [and] [p]otential drug product cross-contamination due to 'unexpected' peaks," (ii) "[l]aboratory investigations into suspect sample results are not conducted according to written procedures," and (iii) "[u]nexpected manufacturing discrepancies, including but not limited to critical equipment failures, are not investigated."

61.     Following the March 2012 Form 483, Defendant Hsu falsely stated that the issues identified in that Form 483 were "independent" from those discussed in the May 2011 Warning Letter.  During a May 1, 2012 conference call to discuss the Company's quarterly earnings, Defendant Hsu referred to the March 2012 Form 483 as only a "temporary roadblock" and that Defendants were "not aware of any outstanding issue" stemming from the May 2011 Warning Letter.  However, as the Company would later acknowledge, the May 2011 Warning Letter and the issues it raised, including the Company's failures to document and investigate unexplained discrepancies, as well as its lack of adequate production and process control procedures, remain open and unresolved, which has caused substantial harm to Impax.

### 7.     The February 2013 Form 483

62.     Remarkably, Defendants still did not adequately address the FDA's observations of significant cGMP violations and, after an inspection from January 8 to February 28, 2013, the FDA issued yet another Form 483 (the "February 2013 Form 483"), which detailed at length cGMP violations at the Hayward facility.  In the February 2013 Form 483, which was addressed to Defendant Hsu, the FDA set forth *twelve* Observations, including three that it designated as "Repeat Observations":

a.     In a "Repeat Observation," the FDA observed that ***"The accuracy, sensitivity, specificity, and reproducibility of test methods have not been established."***  With regard to the Company's key drug in development, Rytary, the FDA observed that "the method validation test performed for [Rytary] . . . is inadequate" due to, among other things, the failure to establish specifications for known impurities, and that "[t]he study to determine the relative response factor (RRF) for impurity . . . was inadequate."  With regard to other commercial products, the FDA observed among other things that "[n]on-suitable test methods are used to release finished drug products," as "[d]uring the establishment inspection, we reviewed test methods for eighteen (18) products and found that *100% of the reviewed methods were not properly validated*";

b.     In a "Repeat Observation," the FDA observed that ***"Control procedures are not established which validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product."***  As a result, with regard to key tests,

"[t]here [wa]s no assurance that the results generated from these studies [we]re accurate and precise." Moreover, there were significant "deviations . . . during . . . shipping studies for the finished bulk drug product," and "[e]stablished manufacturing process parameters [we]re not always validated;"

c. "*There is a failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed.*" The FDA observed that, still, the Company failed to investigate or identify root causes of manufacturing problems, including broken tablets, and harmful condensation and "clumping" in certain materials;

d. "*Appropriate controls are not exercised over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel.*" Among other things, the FDA observed that Impax "did not validate the instruments data integrity acquisition system to ensure that analysts cannot rewrite or delete analytical data during analyses," and "[d]ata audit trails are not maintained and instrument audit logs are not saved" as required;

e. "*Written procedures for cleaning and maintenance fail to include description in sufficient detail of methods, equipment and materials used, description in sufficient detail of the methods of disassembling and reassembling equipment as necessary to assure proper cleaning and maintenance, and parameters relevant to the operation.*" In other words, the FDA observed that Impax's "[c]leaning procedures and operations [we]re deficient." Among other things, the FDA noted the "failure to establish scientific rationale for the use of" specific cleaning agents, and that the Company did not properly report failed tests for "chemical product carryover after the initial cleaning process";

f. "*Batch production and control records do not include complete information relating to the production and control of each batch.*" Among other things, the FDA observed that "[t]here [wa]s a failure to maintain raw data during in-process parameter checks for tablet hardness and thickness";

g. "*Reports of analysis from component suppliers are accepted in lieu of testing each component for conformity with all appropriate written specifications, without establishing the reliability of the supplier's analyses through appropriate validation of the supplier's test results at appropriate intervals.*" The FDA observed that the Company "d[id] not perform testing of raw materials for conformity with all written specifications," and instead "perform[ed] only limited testing" without "establish[ing] the reliability of the supplier's test results," and the Company "ha[d] no documented justification for not performing all tests";

h. *Drug products are not stored under appropriate conditions of humidity so that their identity, strength, quality, and purity are not affected.*" The FDA observed that Impax failed to store certain drug products with necessary "control limits and monitoring procedures to prevent product degradation from moisture";

i. "*An annual report did not include a full description of the manufacturing and control changes not requiring a supplemental application, listed by date in the order in which they were implemented.*" The FDA observed that changes in humidity specifications and blending times during production of certain drugs had not been adequately addressed to ensure consistency;

j.   In a "Repeat Observation," the FDA observed *that "Procedures describing the warehousing of drug products are not followed."*  Despite requirements that Impax electronically account for the location and movement of materials, the Company was unable to account for the status and location of drums of raw materials stored in its warehouse;

k.   *"Written procedures are not followed for evaluations done at least annually and including provisions for a review of complaints, recalls, returned or salvaged drug products, and investigations conducted for each drug product"*; and

l.   *"Employees engaged in the manufacture and processing of a drug product lack the training and experience required to perform their assigned functions."*  The FDA observed that "[e]mployees involved in all aspects of production and analytical testing of drug products are not adequately trained to perform their duties."

63.   Impax's public filings continued to demonstrate the Board's knowledge of these serious cGMP violations and the FDA's actions and scrutiny.  The Impax Annual Report for 2013 was filed with the SEC on a Form 10-K on February 25, 2014, and states in relevant part as follows:

We have received a warning letter and Form 483 observations from the FDA.  If we are unable to promptly correct the issues raised in the warning letter and/or Form 483 observations, our business, results of operations and financial condition could be materially and adversely affected.

In late May 2011, we received a warning letter from the FDA related to an on-site FDA inspection of our Hayward, California manufacturing facility citing deviations from current Good Manufacturing Practices (cGMP), which are extensive regulations governing manufacturing practices for finished pharmaceutical products and which establish requirements for manufacturing processes, stability testing, record keeping and quality standards and controls.  The FDA observations set forth in the warning letter related to sampling and testing of in-process materials and drug products, production record review, and our process for investigating the failure of certain manufacturing batches (or portions of batches) to meet specifications.  During the quarters ended March 31, 2012 and 2013, the FDA conducted inspections of our Hayward manufacturing facility and at the conclusion of each inspection, we received a Form 483.  The Form 483 issued during the quarter ended March 31, 2012 contained observations primarily relating to our Quality Control Laboratory and the Form 483 issued during the quarter ended March 31, 2013 contained several observations pertaining to the operations of the Hayward facility, three of which were designated by the FDA as repeat observations from inspections that occurred prior to the warning letter.  We provided the FDA with what we believe to be our complete written responses relating to the observations in the warning letter and the Form 483 issued in 2012.  In connection with the Form 483 issued in 2013, we provided our written response to the FDA during the first quarter ended March 31, 2013 and continue to provide the FDA with updates.  In late October 2013, at the FDA's request, we participated in a regulatory meeting with representatives of the FDA to provide additional information and clarifications on our response and updates related to the Form 483 issued in 2013.  We will continue to provide information to the agency about our quality and manufacturing improvement programs and have committed to answering any questions FDA might have on

any applications or programs. We believe that a satisfactory re-inspection of our Hayward manufacturing facility would be required to close out the warning letter and resolve the 2013 Form 483 observations. The FDA did not notify us at the meeting of any additional enforcement actions, however, no assurance can be given as to whether the FDA will take any further actions. We are currently cooperating with the FDA to close out the warning letter and resolve the Form 483 observations. The warning letter and Form 483 observations do not currently place restrictions on our ability to manufacture and ship our existing products.

* * *

Unless and until the warning letter is closed out and the Form 483 observations resolved, it is possible we may be subject to additional regulatory action by the FDA as a result of the current or future FDA observations, including, among others, monetary sanctions or penalties, product recalls or seizure, injunctions, total or partial suspension of production and/or distribution, and suspension or withdrawal of regulatory approvals. Additionally, the FDA has withheld and may continue to withhold approval of pending drug applications currently or previously listing our Hayward, California facility as a manufacturing location of finished dosage forms until the warning letter is closed out and the Form 483 observations are resolved. For instance, in January 2013, the FDA issued a Complete Response Letter regarding our NDA for our late stage branded pharmaceutical product candidate, RYTARY™, which we are developing internally, for the symptomatic treatment of Parkinson's disease. In the Complete Response Letter, the FDA indicated that it required a satisfactory inspection of our Hayward manufacturing facility as a result of the warning letter issued to us in May 2011 before the NDA may be approved by the FDA due to the facility's involvement in the development of RYTARY™ and supportive manufacturing and distribution activities. During the assessment of the NDA, we had amended the NDA to withdraw the Hayward site as an alternative site of commercial production in the launch of RYTARY™. We are currently working with the FDA on the appropriate next steps for the RYTARY™ NDA and, as noted above, on closing out the warning letter, however we cannot be assured of when that will occur. Further, other federal agencies, our customers and partners in our alliance, development, collaboration and other partnership agreements with respect to our products and services may take the warning letter and the Form 483 observations into account when considering the award of contracts or the continuation or extension of such partnership agreements. Any such actions could significantly disrupt our business and harm our reputation, resulting in a material adverse effect on our business, results of operations and financial condition.

64. The 2013 Annual Report was signed by Defendants Hsu, Reasons, Burr, Benet, Chao, Fleming, Markbreiter, Tereri, and Pendergast.

65. Additionally, both the Board as a whole and the Audit Committee had responsibility for oversight of enterprise risk. For example, Impax's proxy statement for 2013 states in relevant part as follows:

**Board's Role in Risk Oversight**

We are exposed to a number of risks and undertake at least annually an enterprise risk management review to identify and evaluate these risks and to develop plans

to manage them effectively. It is management's responsibility to manage risk and bring the material risks applicable to the company to the board's attention. The board has oversight responsibility of the processes established to report and monitor these risks. On behalf of the board, the audit committee plays a key role in the oversight of our enterprise risk management function. Mr. Reasons, our Chief Financial Officer, is directly responsible for our enterprise risk management function and reports both to the President and Chief Executive Officer and to the audit committee in this capacity. In fulfilling his risk-management responsibilities, Mr. Reasons works closely with members of our senior management and meets with the audit committee to discuss the risks facing our company, highlighting any new risks that may have arisen since the committee last met. The audit committee also reports to the board on a regular basis to apprise them of their discussions with Mr. Reasons regarding our enterprise risk management efforts. Finally, Mr. Reasons reports directly to the board on at least an annual basis to apprise it directly of our enterprise risk management efforts. In addition to the audit committee, the other committees of the board consider the risks within their areas of responsibility. For example, the compensation committee considers the risks related to our compensation programs and, in setting compensation, strives to create incentives that do not encourage risk-taking behavior that is inconsistent with the company's business strategy. The nominating committee considers risks related to succession planning and oversees the appropriate allocation of responsibility for risk oversight among the committees of the board. We believe that our current leadership structure supports the board's risk oversight role.

66.     During this period of time, Defendants Burr, Chao, Markbreiter, and Terreri were members of the Audit Committee and Defendants Hsu, Benet, and Fleming were also members of the Board.

67.     Further, Defendants Hsu, Koch, Nestor, and Reasons were members of senior management with knowledge and responsibility of, and responsibility to address, these serious regulatory violations.

68.     In addition, the market understood that the recurring cGMP violations and FDA scrutiny that Impax suffered were materially harmful to the Company. After the Company announced the February 2013 Form 483 after the close of trading on March 4, 2013, the Company's stock dropped significantly on extremely high trading volume. Specifically, after closing at $20.00 per share on March 4, 2013, Impax's stock fell 26% to close at $14.80 on March 5, 2013, on trading volume of 11.7 million shares, more than sixteen times higher than the average trading volume for Impax stock.

**D.** **Defendants' Failures To Address The Persistent Problems Identified By The FDA Caused The FDA To Withhold Approval Of Rytary, And GlaxoSmithKline To Terminate A Key Agreement With Impax**

69. As detailed above, through Forms 483 and the May 2011 Warning Letter identifying significant failures at the Hayward facility between 2009 and 2013, including without limitation, drug contamination, controls failures, and the failure to identify root causes of a variety of serious problems, Defendants were on notice of underlying problems at the Hayward facility that posed grave risk to the Company's continued earnings and operations. As a direct result of Defendants' failures to address those problems and ensure compliance with all applicable laws and cGMP regulations, the FDA in January 2013 refused to approve Rytary.

70. On January 21, 2013, the Company issued a press release, filed with the SEC on a Form 8-K signed by Defendant Reasons, announcing that the FDA rejected Impax's NDA for Rytary because "the FDA requires a satisfactory re-inspection of the company's Hayward facility as a result of the warning letter issued in May 2011 before the company's NDA may be approved." The press release further noted that "the company withdrew the Hayward site as an alternative site of commercial production at launch."

71. In addition, Impax had entered into an agreement with GlaxoSmithKline in December 2010 for GSK to develop and commercialize Rytary outside of the United States and Taiwan. On April 29, 2013, the Company issued a press release, filed with the SEC on a Form 8-K signed by Defendant Reasons, stating that GSK had terminated its agreement with Impax due to "delays in the anticipated regulatory approval and launch dates." As a result, GSK would not be working to develop and commercialize Rytary outside the United States and Taiwan, leaving Impax searching for new partners to help develop and sell the drug in markets outside the United States.

72. Further, on April 11, 2014, Impax issued a press release acknowledging that it had to resubmit its new drug application ("NDA") for Rytary, and a satisfactory inspection of manufacturing facilities is required:

> After discussions with the FDA, the Company has resubmitted the NDA for RYTARY providing updated safety and stability information. The FDA will require an inspection of manufacturing facilities involved in the production of RYTARY in connection with the resubmission. The FDA has designated the

NDA filing for RYTARY as a Class 2 resubmission for review purposes and has 14 calendar days to officially accept the NDA resubmission.

**E.     Defendants' Failures To Ensure cGMP
        Compliance At Impax's Manufacturing Facilities Continue**

73.     Despite the myriad FDA warnings and Observations detailed above, Defendants have still failed to ensure legal and cGMP compliance, causing further harm to the Company.

### 1.     The 2014 Taiwan Form 483

74.     In light of the endemic problems at the Hayward facility, Impax's Taiwan facility is especially important as it must inevitably bear more of a production burden if the Company's operations are to continue and to grow.  However, recent regulatory action indicates that the Taiwan facility suffers from debilitating problems much the same as the Hayward facility.

75.     Between July 21 and 26, 2014, the FDA performed an inspection of the Taiwan facility.  At the end of that inspection, on July 26, 2014, the FDA issued a Form 483, addressed to the President of the Taiwan facility, Chen-Tang Chang (the "2014 Taiwan Form 483").  As the Company stated in a July 29, 2014 press release, filed with the SEC on a Form 8-K signed by Defendant Reasons, the FDA inspected the Taiwan facility in part as a "Pre-Approval Inspection" for Rytary.

76.     The 2014 Taiwan Form 483 identified ten Observations.  Specifically, the FDA observed that:

    a.     *"Equipment used in the manufacture of drug products is not appropriately validated to facility operations for its intended use"*;

    b.     *"Examination and testing of samples is not done to assure that in-process materials conform to specifications"* including capsule weight and the relative strength of components, which is "critical for product performance";

    c.     *"Drug products failing to meet established specifications are not rejected"*;

    d.     The Company *"ha[s] not established an acceptable range of process parameters for . . . quality attributes"* for certain drugs;

    e.     *"In October 2013, [Impax] experienced aberrant test results for six lots"* of a drug;

    f.     *"There is a failure to conduct a thorough review of the failure of a batch or any of its components to meet any of its specifications whether or not the batch has*

*been already distributed," and Impax "failed to initiate timely corrective and preventive actions for this [d]eviation";*

g.   *Impax's "Quality, Engineering, and Production Departments do not evaluate [temperature and humidity] information to identify if there are drifts and/or trends in your processing controls that should be adjusted or corrected";*

h.   *"Establishment of the reliability of the component supplier's report of analysis is deficient in that the test results are not appropriately validated at appropriate intervals";*

i.   The Company's "Annual Product Review" procedure *"failed to include the requirement for a timely annual review of your Rx drug products and you did not generate an annual (12 months) report of complaints, recalls, returned drug product, investigations, and process controls"* for multiple drugs; and

j.   *"Procedures designed to prevent objectionable microorganisms in drug products not required to be sterile are not established."*

77.     As the Company stated in its July 29, 2014 press release, it is not yet clear what impact the violations discussed in the 2014 Taiwan Form 483 will have on the Company's application to produce Rytary at the Taiwan facility.

78.     In addition, the market understood that the cGMP violations and FDA scrutiny concerning the Taiwan facility, on top of the recurring problems that were already apparent at the Hayward facility, were materially harmful to the Company.  After the Company announced the 2014 Taiwan Form 483 on July 29, 2014, the Company's stock dropped significantly on high trading volume.  Specifically, after closing at $28.03 per share on July 28, 2014, Impax's stock fell 15.2% to close at $23.76 on July 29, 2014, on trading volume of 4.3 million shares, more than six times higher than the average trading volume for Impax stock.

## 2.     The 2014 Hayward Form 483

79.     On August 4, 2014, just days after the 2014 Taiwan Form 483, and after repeated pledges by Defendants to adequately address the FDA's concerns about recurring problems at the Hayward facility, Impax issued a press release announcing yet another unsatisfactory FDA inspection, resulting in yet another Form 483 in connection with that facility.

80.     Specifically, the FDA inspected the Hayward facility between June 16 and July 31, 2014, and issued a Form 483 addressed to current President and CEO Defendant Wilkinson on July 31, 2014 (the "2014 Hayward Form 483").  The 2014 Hayward Form 483 contained

seven Observations, including two designated as "Repeat Observations" and others that echoed earlier FDA warnings and Observations.  Specifically, the FDA observed that:

    a. ***"There is a failure to thoroughly review any unexplained discrepancy whether or not the batch has been already distributed"***;

    b. In a "Repeat Observation," the FDA wrote that ***"The accuracy sensitivity, specificity, and reproducibility of test methods have not been established and documented."***  The FDA observed that the Company had "changed multiple conditions simultaneously," and that "[n]o justification was provided for this approach that may mask the opposing effects of multiple changes."  Further, the FDA observed that Impax failed to address "significant deviation" in certain test results;

    c. ***"Written procedures for cleaning and maintenance fail to include description in sufficient detail of methods, equipment and materials used and instructions for protection of clean equipment from contamination prior to use."***  Even after certain cleaning was completed, the FDA observed "residual rayon fibers" that contaminated key equipment, in part because the Company's written procedures did not adequately instruct employees how to inspect the equipment;

    d. In a "Repeat Observation," the FDA wrote that ***"Appropriate controls are not exercised over computers or related systems to assure that changes in master production and control records or other records are instituted only by authorized personnel."***  The FDA again observed that Impax "did not have validated data acquisition systems to ensure that analysts cannot re-write or delete analytical data during analyses";

    e. ***"The responsibilities and procedures applicable to the quality control unit are not fully followed."***  The FDA observed "sampler vials" that were apparently used in conjunction with the wrong type of laboratory equipment, "lacked reference to the test method or notebook," and other instances where personnel did not follow written procedures or properly dispose of waste;

    f. ***"Buildings used in the manufacturing and holding of a drug product are not maintained in a good state of repair."***  The FDA documented instances of disrepair at the Hayward facility, including rust stains on the floor, copper piping improperly covered in silicone-epoxy, sagging ceiling tiles, and corrosion on the facility's condensate drain pan; and

    g. ***"Changes to written procedures are not drafted, reviewed and approved by the appropriate organizational unit."***

    81.    As Impax itself has acknowledged, the violations detailed in the 2014 Taiwan and Hayward Forms 483 may result in significant, negative consequences to the Company.  As the Company's Form 10-Q quarterly report filed with the SEC on August 6, 2014, and signed by Defendants Reasons and Wilkinson states:

The FDA performed a re-inspection of our Hayward manufacturing facility during June and July 2014.  At the conclusion of the re-inspection, the FDA issued a Form 483 with seven inspectional observations, two of which were designated by the FDA as repeat observations from the inspection that occurred in 2013.  To

date, we have not been informed by the FDA as to whether a satisfactory re-inspection of our Hayward manufacturing facility will be required to close out the warning letter and resolve the 2014 Form 483 observations on our Hayward manufacturing facility.

In July 2014, the FDA conducted an inspection of our Taiwan manufacturing facility and at the conclusion of the inspection, we received a Form 483 with ten observations. The FDA did not provide any status or classification to either the Form 483 observations on our Hayward or Taiwan manufacturing facilities and, pursuant to its established regulatory process, will wait until they have received and reviewed our responses to classify those inspections. We also have not been informed by the FDA of the impact the Forms 483 will have on RYTARY's PDUFA review date of October 9, 2014.

To date, the FDA has not notified us of any additional enforcement actions at either the Hayward or Taiwan manufacturing facilities, however, no assurance can be given as to whether the FDA will take any further actions. We are currently working on our response and updates to the Forms 483 and we intend to continue to provide updates to the agency. . . .

This work is ongoing and we are committed to improving our quality control and manufacturing practices. We cannot be assured, however, that the FDA will be satisfied with our corrective actions and as such, we cannot be assured of when the warning letter will be closed out. Unless and until the warning letter is closed out and the Form 483 observations resolved, it is possible we may be subject to additional regulatory action by the FDA as a result of current or future FDA observations, including, among others, monetary sanctions or penalties, product recalls or seizure, injunctions, total or partial suspension of production and/or distribution, and suspension or withdrawal of regulatory approvals. Additionally, the FDA has withheld and may continue to withhold approval of pending drug applications listing our Hayward, California facility as a manufacturing location of finished dosage forms until the warning letter is closed out and the Form 483 observations on our Hayward facility are resolved. Further, other federal agencies, our customers and partners in our alliance, development, collaboration and other partnership agreements with respect to our products and services may take the warning letter and Form 483 observations into account when considering the award of contracts or the continuation or extension of such partnership agreements. If we are unable promptly to correct the issues raised in the warning letter and Form 483 observations, our business, consolidated results of operations and consolidated financial condition could be materially and adversely affected.

82. On September 17, 2014, Impax issued another press release acknowledging that its continuing failure to comply with cGMP and the FDA's actions were further delaying the potential approval of Rytary:

. . . Impax Pharmaceuticals, the branded products division of Impax Laboratories, Inc. (NASDAQ: IPXL) today announced that the U.S. Food and Drug Administration (FDA) has extended the Prescription Drug User Fee Act (PDUFA) date for its review of the RYTARY™ (IPX066) New Drug Application (NDA) from October 9, 2014, to January 9, 2015.

The Company amended the chemical, manufacturing and control (CMC) section of the RYTARY NDA subsequent to its submission of responses to the July 26,

2014 Form 483 observations at the Taiwan facility. The FDA notified the Company that such amendment constituted a major amendment. Since the receipt date of this additional information is within three months of the PDUFA date, the FDA has extended the PDUFA date to review the information. No additional information was requested by the Agency.

83. Again, at all relevant times, including the periods leading up to and following the 2014 Taiwan and Hayward Forms 483, the Board as a whole and the Audit Committee had responsibility for oversight of enterprise risk. In addition, following the creation of the Compliance Committee in May 2013, the Compliance Committee shared that responsibility. As Impax's proxy statement for 2014 states in relevant part:

**Board's Role in Risk Oversight**

We are exposed to a number of risks and undertake at least annually an enterprise risk management review to identify and evaluate these risks and to develop plans to manage them effectively. It is management's responsibility to manage risk and bring the material risks applicable to the Company to the board's attention. The board has oversight responsibility of the processes established to report and monitor these risks. On behalf of the board, the audit committee plays a key role in the oversight of our enterprise risk management function. Mr. Reasons, our Chief Financial Officer, is directly responsible for our enterprise risk management function and reports both to the President and Chief Executive Officer and to the audit committee in this capacity. In fulfilling his risk-management responsibilities, Mr. Reasons works closely with members of our senior management and meets with the audit committee to discuss the risks facing our company, highlighting any new risks that may have arisen since the committee last met. The audit committee also reports to the board on a regular basis to apprise them of their discussions with Mr. Reasons regarding our enterprise risk management efforts. Finally, Mr. Reasons reports directly to the board on at least an annual basis to apprise it directly of our enterprise risk management efforts. In addition to the audit committee, the other committees of the board consider the risks within their areas of responsibility. For example, the compensation committee considers the risks related to our compensation programs and, in setting compensation, strives to create incentives that do not encourage risk-taking behavior that is inconsistent with the Company's business strategy. The nominating committee considers risks related to succession planning and oversees the appropriate allocation of responsibility for risk oversight among the committees of the board. We believe that our current leadership structure supports the board's risk oversight role.

84. During this period of time, Defendants Burr, Chao, Markbreiter, and Terreri were members of the Audit Committee; Defendants Benet, Chao, Pendergast, and Terreri were members of the Compliance Committee; and Defendants Hsu and Fleming were also members of the Board.

85. Further, Defendants Hsu, Reasons, Nestor, and Wilkinson were members of

senior management with knowledge of, and responsibility to address, these continuing serious regulatory violations.

**F.     Defendants' Knowledge Of Breaches Of
         Fiduciary Duties Was Highlighted By Prior Lawsuits**

86.     In addition to the myriad harms that the Company itself has acknowledged have flowed from Defendants' failures to ensure compliance with legal obligations and cGMP regulations, the misconduct detailed above – along with numerous false statements, including materially misleading misstatements and omissions by certain of the Defendants in this derivative action – gave rise to a securities class action.

87.     In 2013, numerous plaintiffs filed securities class actions alleging that Impax, and Defendants Hsu and Koch, violated the federal securities law by making or causing to be made materially false and misleading statements in connection with the Company's response to the Forms 483 and the May 2011 Warning Letter discussed above.  The securities class action plaintiffs alleged that those defendants thereby failed to disclose the true nature of the persistent problems in the Hayward facility and further misrepresented the scope, nature, and efficacy of defendants' remediation efforts.

88.     After those actions were consolidated and a consolidated complaint (the "Class Action Complaint") was filed, the securities defendants moved to dismiss.  On April 18, 2014, United States District Judge Edward M. Chen denied defendants' motion to dismiss, concluding that the Class Action Complaint

> alleges recurring and pervasive problems with the manufacturing and quality control processes at Impax's Hayward facility – many of which were identified by the FDA on more than one occasion.  Other allegations describe actions which call into question whether there was ever a true commitment to remedy the manufacturing and quality control problems. . . .

> Further, the 2011 Warning Letter highlighted two issues – (1) lack of written procedures to monitor and validate manufacturing processes that could have caused product variability and (2) failure to investigate deviations in the manufacturing process. . . . [S]imilar observations were raised by the FDA in the 2013 Form 483. . . . Thus, similar issues were subsequently found 18 months after Defendant stated that they had implemented changes to address the FDA concerns.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.

-29-

89.     Further, addressing whether the securities plaintiffs had adequately alleged that the securities defendants acted with scienter, Judge Chen concluded that

> it is "absurd" to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions pervading their company's manufacturing and quality control divisions – the heart of a company whose main business is manufacturing pharmaceuticals for public consumption. The idea that the defendants here would be unaware of these manufacturing and quality control problems is even more unlikely given the repeated Forms 483 and the Warning Letter from the FDA. Forms 483 are intended according to Plaintiffs, to inform "top management" of "significant objectionable conditions" according to plaintiffs. . . . An inference of scienter is strengthened that the allegation of pervasive and long standing problems which allegedly were covered up as a matter of policy at Impax.
>
> Therefore, given the importance of manufacturing and quality control to the success of Impax and the fact that both areas of operation had been flagged by the FDA, it is a logical, and strong, inference that the defendants were aware of the alleged severe and pervasive problems in Impax's Hayward facility.

### G.     Despite Knowledge Of Serious Regulatory Violations, Defendants Allowed Those Violations To Recur

90.     In light of the numerous Forms 483 and the May 2011 Warning Letter from the FDA discussing serious regulatory violations at the Hayward and Taiwan facilities, Defendants had an obligation to ensure that adequate corrective action was taken. As discussed in more detail below, each of the Defendants was on notice of those violations. However, Defendants have consciously failed to ensure the violations were corrected, and have thereby caused significant harm to the Company.

91.     All of the current members of the Impax Board, named herein as the Director Defendants, had actual knowledge of the cGMP violations discussed herein, as evidenced by their signing numerous SEC filings – including Annual Reports filed on Forms 10-K and Quarterly Reports filed on Forms 10-Q – that discussed the May 2011 Warning Letter and Forms 483, as well as the harms and risks to the Company resulting from the FDA's scrutiny and actions, and the Company's regulatory violations.

92.     Moreover, as fiduciaries of the Company, each of the Director and Officer Defendants was aware of the Company's regulatory scrutiny and violations in light of the material impact of those violations on the Company's business, including the FDA's denial of

approval of the Company's key drug, Rytary; the Company's loss of its key commercial partner GSK; lost commercial opportunities; lost sales; and exposure to significant risk of FDA actions with increasing severity.

93.     In addition, Defendant Hsu, as President and CEO, was aware of the significant "red flags" discussed above, including by virtue of being the named addressee of the January 2011, March 2012, and February 2013 Forms 483, and the May 2011 Warning Letter.  Also, as the Company's most senior executive officer, Hsu was directly responsible for addressing the Company's prolonged and willful non-compliance with legal requirements and cGMP regulations.  Further, Defendants Hsu, Benet, Burr, Fleming, Markbreiter, and Terreri have each served on the Impax Board since at least April 2009, prior to the issuance of the first Form 483 discussed above, and Defendant Chao has served on the Board since April 8, 2010, after the August 2009 Form 483, but prior to the issuance of the subsequent Forms 483 and the May 2011 Warning Letter discussed herein.

94.     Further, Defendants Benet, Chao, and Terreri, who have served on the Board since 2001, 2010, and 2003 respectively, have served on the Board's Compliance Committee since its establishment in May 2013, and Defendant Pendergast joined the Compliance Committee in July 2013.  The members of the Compliance Committee have the specific responsibility to oversee the Company's regulatory compliance with the FDA's rules, regulations and guidance, and when appropriate report and make recommendations to the Board with respect to such policies and practices.

95.     Despite each Defendant's knowledge of the FDA's scrutiny and action, and the serious recurring cGMP violations at the Company, those violations remain unaddressed to this day, causing significant harm to Impax.

## V.     DEFENDANTS' FIDUCIARY DUTIES

96.     By reason of their positions as officers, directors, and fiduciaries of Impax and because of their ability to control the business and corporate affairs of Impax, Defendants owed Impax fiduciary duties of care, loyalty, and good faith, as well as the duty to disclose (or candor), and were and are required to use their full ability to control and manage Impax in a fair, just,

honest, and equitable manner, including ensuring compliance with all applicable laws and regulations.

97. Defendants were and are required to act primarily in furtherance of the best interests of Impax so as to benefit the Company, and not in furtherance of their personal interests or benefits. Each director and officer of the Company owes to Impax and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

98. Defendants, because of their positions of control and authority as directors and/or officers of Impax, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, and the Company's responses thereto.

99. To discharge their duties, the officers and directors of Impax were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Impax were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal, state, and foreign laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

100. The Impax Code of Business Conduct and Ethics (the "Ethics Code"), which "reflects the values that define the Company and the principle that we must strive to avoid any circumstances that may give rise to even an appearance of impropriety," governs the conduct of (among others) each of the Defendants. Under the Ethics Code, each Defendant "is personally responsible for making sure that our business decisions and actions comply at all times with the rules and regulations of federal, state and local governments and other appropriate private and

public regulatory agencies, and this Code. . . . In addition, each of us has a duty to report behavior on the part of others that appears to violate this Code or any other compliance policy or procedure of the Company."

101.    Moreover, the Ethics Code specifically provides that "[a]ll supervisory and management personnel, including all officers and directors of the Company, have a special responsibility to lead according to the standards of this Code, in both words and action." The Ethics Code states among other things that:

    a.    "Wherever we do business, we are required to comply with all applicable laws, rules, and regulations"; and

    b.    "[T]he Company is obligated to make various disclosures to the public. The Company is committed to full compliance with all requirements applicable to its public disclosures. The Company has implemented disclosure controls and procedures to assure that its public disclosures are compliant and otherwise full, fair, accurate, timely and understandable. All employees responsible for the preparation of the Company's public disclosures, or who provide information as part of that process, have a responsibility to assure that such disclosures and information are complete, accurate and in compliance with the Company's disclosure controls and procedures."

102.    In addition, the Company's Compliance Committee Charter requires that the Compliance Committee, comprising Defendants Benet, Chao, and Terreri, "assist[] the Board in overseeing the Company's activities in the areas of regulatory compliance with the [FDA's] rules, regulations and guidance." Specifically, Section IV of the Compliance Committee Charter provides that the Compliance Committee shall, among other things:

    a.    "assist the Board in its oversight of FDA regulatory compliance and responsibility";

    b.    "oversee the Company's compliance policies and practices in areas of FDA regulatory compliance and responsibility and when appropriate report and make recommendations to the Board with respect to such policies and practices";

    c.    "review the [Compliance] Committee's performance and the performance of its members at least annually"; and

    d.    "make such other recommendations to the Board on such matters, within the scope of its function, as may come to its attention and which in its discretion warrant consideration by the Board."

## VI.    **DEMAND ON THE BOARD OF DIRECTORS WOULD BE FUTILE**

103.    Plaintiff brings this action derivatively in the right and for the benefit of Impax to redress the breaches of fiduciary duty and other violations of law by Defendants as alleged herein.

104.    Plaintiff will adequately and fairly represent the interests of Impax and its shareholders in enforcing and prosecuting Impax's rights, and Plaintiff has retained counsel experienced in prosecuting this type of action.

105.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein this section.

## VII.    **DEMAND EXCUSED ALLEGATIONS**

106.    Plaintiff has not made a demand on the Impax Board to bring suit asserting the claims set forth herein because pre-suit demand was excused as a matter of law.

107.    At the time this action was initiated, the Board was comprised of nine directors: Defendants Burr, Benet, Chao, Fleming, Hsu, Markbreiter, Pendergast, Terreri, and Wilkinson. A majority of the members of the Board (a) would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in Impax's recurring, significant violations; and/or (b) engaged in conduct that is not a legitimate exercise of business judgment and therefore does not have the protections of the business judgment rule, in turn exposing them to a substantial risk of personal liability in the event they pursued the claims alleged herein.

### A.    **A Majority Of The Board Faces A Substantial Likelihood Of Liability**

#### 1.    **All The Current Members Of The Impax Board Had Actual Knowledge Of The Violations**

108.    All of the current members of the Impax Board, named herein as the Director Defendants, had actual knowledge of the cGMP violations discussed herein. Each signed SEC filings discussing the May 2011 Warning Letter. Specifically, on February 28, 2012, the Company filed its 2011 Annual Report on Form 10-K, signed by Director Defendants Hsu, Burr, Benet, Chao, Fleming, Markbreiter, and Terreri. On February 26, 2013, the Company filed its

2012 Annual Report on Form 10-K, signed by those same Director Defendants. On February 25, 2014, the Company filed its 2013 Annual Report on Form 10-K, signed by those same Director Defendants, along with Defendant Pendergast as well. Each of the 2011, 2012 and 2013 Annual Reports discussed the Company's receipt of the May 2011 Warning Letter as well as the harms and risks to the Company resulting from the FDA's scrutiny and actions, and the Company's regulatory violations.

109. In addition, on August 6, 2014 – after Defendant Wilkinson joined the Board on May 14, 2014 – the Company filed its Quarterly Report on Form 10-Q for the period ended June 30, 2014, signed by Defendant Wilkinson (the "August 2014 10-Q"). The August 2014 10-Q likewise discussed the Company's receipt of the May 2011 Warning Letter as well as the harms and risks to the Company resulting from the FDA's scrutiny and actions, and the Company's regulatory violations.

110. Moreover, as the directors of the Company, each of the Director Defendants was aware of the Company's regulatory scrutiny and violations in light of the material impact of those violations on the Company's business. As detailed herein, the Company's violations have resulted in the FDA's denial of approval, for several years, for the Company's key drug, Rytary. In addition, the Company has lost its key commercial partner GSK, lost commercial opportunities, lost sales, and exposed itself to significant risk of FDA actions with increasing severity. The Board was surely aware of these factors that materially affected the Company's core business operations.

111. Further, as detailed in Impax's annual proxies, the members of the Board are charged with overseeing risk at the Company, including overseeing officers' management of such risk.

### 2. Defendant Hsu Had Actual Knowledge Of, And Directly Oversaw, The Violations

112. Defendant Hsu faces a substantial likelihood of liability because he served as the Company's President and CEO between October 2006 and April 21, 2014, and has served as a director of Impax since 1999. Moreover, between 1999 and October 2006, Hsu served as

Impax's President and COO, and founded the predecessor entity Impax Pharmaceuticals, Inc. in 1994. As such, Hsu was aware of the significant "red flags" discussed above, including by virtue of being the named addressee of the January 2011, March 2012, and February 2013 Forms 483, and the May 2011 Warning Letter. Also, as the Company's most senior executive officer, Hsu was directly responsible for addressing the Company's prolonged and willful non-compliance with legal requirements and cGMP regulations.

113. Defendant Hsu has received significant compensation due to his employment at Impax, including nearly $5.1 million in 2013 alone, and as indicated above has a lengthy, close relationship with the Company and its operations. He therefore cannot impartially consider a demand.

> **3.** **Seven Director Defendants Who Are Currently Members Of The Board Have Served Since At Least April 2010 And Breached Their Duties In Refusing To Engage In Good Faith Oversight Of The Company's Internal Controls And Compliance Efforts**

114. Defendants Hsu, Benet, Burr, Fleming, Markbreiter, and Terreri have each served on the Impax Board since at least April 2009, prior to the issuance of the first Form 483 discussed herein. In addition, Defendant Chao has served on the Board since April 8, 2010, after the August 2009 Form 483, but prior to the issuance of the subsequent Forms 483 and the May 2011 Warning Letter discussed herein. Each of these Board members was aware of, and improperly refused to take corrective action to address, the endemic, recurring problems that the FDA identified in the Forms 483 and the May 2011 Warning Letter.

115. As discussed above, Defendant Hsu himself was the named addressee of the January 2011, March 2012, and February 2013 Forms 483, and the May 2011 Warning Letter.

116. In addition, on March 13, 2013, Impax shareholder Nicholas Karant made a demand on the Impax Board under Delaware law to investigate potential breaches of fiduciary duty in connection with the legal and cGMP violations detailed herein, and to commence a civil action against substantially the same defendants as Defendants herein. *See Karant v. Hsu*, Case No. 3:14-cv-04313-JCS (N.D. Cal.). Defendants' counsel then sent a letter on June 5, 2013, in which defendants did not decisively respond to that demand, but wrote that "Impax's [Board] has

met and discussed the issues raised in [the] March 13, 2013 Demand Letter." That letter also indicated the Board's knowledge of the securities class action discussed above and other actions raising similar issues in connection with the Company's recurring violations. By Defendants' own admission, then, the Board members at that time – including Hsu, Benet, Burr, Fleming, Markbreiter, Terreri, and Chao – had actual knowledge of the significant recurring violations that the FDA identified in the numerous Forms 483 and the May 2011 Warning Letter between 2009 and 2013.

117.     Accordingly, those seven Board members received and were aware of numerous "red flags" between 2009 and 2013 that necessarily informed them of the significant, recurring legal and cGMP violations taking place at Impax. Given the duties placed on the directors and the requirements to take corrective measures imposed by the FDA, to the extent any of those Director Defendants did not have actual knowledge of those violations, such lack of knowledge could only be the product of willful blindness that constitutes a bad-faith breach of fiduciary duty.

118.     Defendants Hsu, Benet, Burr, Fleming, Markbreiter, Terreri, and Chao were required to act upon this information to protect the Company from continued and further legal and regulatory violations. They did not do so, and instead allowed rampant violations to continue. Thus, five years after the August 2009 Form 483, the Hayward facility and the Taiwan facility face intense regulatory scrutiny regarding the violations documented in the 2014 Forms 483, the FDA has refused to approve Rytary, the Company has lost a valuable contract with GSK, and the Company itself admits that it faces numerous significant risks that pose material harm to the Company's earnings and operations. As a result, these seven Defendants, constituting a majority of Impax's nine-member Board, face a substantial likelihood of liability for their conduct, and demand is excused.

### 4.     Four Director Defendants Who Are Currently Members Of The Board Serve On The Compliance Committee

119.     In addition to the reasons stated above, Defendants Benet, Chao, and Terreri, who have served on the Board since 2001, 2010, and 2003 respectively, have served on the Board's

Compliance Committee since its establishment in May 2013, and Defendant Pendergast joined the Compliance Committee in July 2013. Each faces a substantial likelihood of liability as a result of his/her conduct on the Compliance Committee.

120. As discussed above, the members of the Compliance Committee have the specific responsibility to oversee the Company's regulatory compliance with the FDA's rules, regulations and guidance, and when appropriate report and make recommendations to the Board with respect to such policies and practices. As such, these Defendants were unquestionably aware of the numerous "red flags" of legal and regulatory violations discussed above.

121. In violation of their duties to Impax, Defendants Benet, Chao, Terreri, and Pendergast failed to intervene and implement adequate corrective measures to ensure that the Hayward and Taiwan facilities were fully compliant with all applicable laws and regulations, and thereby protect the Company from significant harm. Accordingly, these Defendants face a substantial likelihood of liability.

**B.      The Board's Misconduct Is
        <u>Not A Valid Exercise Of Business Judgment</u>**

122. The Director Defendants' challenged misconduct at the heart of this case constitutes knowingly and consciously presiding over the Company's willful failures to comply with applicable laws and cGMP regulations. The Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate non-compliance with legal and regulatory requirements aimed at ensuring that unsafe, adulterated drugs do not harm consumers and the public. Such legal and regulatory violations are not legally protected business decisions and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

123. Significantly, Impax and its Board were repeatedly and unquestionably informed by the FDA about systemic legal and regulatory violations that exposed the Company to regulatory enforcement actions and penalties, as well as legal and other liabilities. The Board's decision not to take adequate corrective action and instead knowingly allow Impax to operate its manufacturing facilities in violation of applicable laws and regulations cannot be regarded as a

valid exercise of business judgment.

## VIII.  CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTY
**(Against the Director Defendants)**

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though set forth herein.

125.    Each of the Director Defendants owed and owes fiduciary duties to Impax.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Impax the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including the oversight of Impax's compliance with all legal and regulatory obligations.  In addition, the Board had specific fiduciary duties as defined by the Company's corporate governance documents, including the Ethics Code and the Compliance Committee Charter, and principles that, had they been discharged in accordance with Director Defendants' obligations, would have necessarily prevented the misconduct and violations and the consequent harm to the Company alleged herein.

126.    The Director Defendants consciously violated their fiduciary responsibilities by, among other things, failing and refusing to take adequate corrective measures to address the legal and regulatory violations that the FDA identified in the Forms 483 and the May 2011 Warning Letter discussed herein.

127.    As a direct and proximate result of the Director Defendants' conscious failures to perform their fiduciary duties, Impax has faced and continues to face significant regulatory scrutiny and is exposed to significant risks, the FDA has refused to approve the Company's key new drug, Rytary, and GSK has withdrawn from an important contract with Impax.  Impax has sustained significant damages, both financially and to its corporate image and goodwill.  Such damage includes, and will include, the substantial regulatory action and civil liability described herein.

128.    As a result of the misconduct described herein, the Director Defendants are liable to the Company.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(Against the Officer Defendants)**

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though set forth herein.

130.    By reason of their positions as fiduciaries to the Company, the Officer Defendants owed and owe duties of good faith, loyalty, candor, and truthful disclosure.  The Officer Defendants were well aware of all applicable legal and regulatory obligations, including cGMP requirements, as well as the Company's receipt of the Forms 483 and the May 2011 Warning Letter discussed above, and were duty-bound to enforce the Company's compliance with those laws and regulations and take adequate corrective action in response to the Forms 483 and the May 2011 Warning Letter.

131.    The Officer Defendants consciously violated and breached these duties by causing Impax to willfully fail to comply with legal and regulatory obligations, including by failing to take adequate, necessary corrective action in response to the Forms 483 and the May 2011 Warning Letter.

132.    As a direct and proximate result of the Officer Defendants' breaches of fiduciary duty, Impax has sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

133.    The Officer Defendants are liable to the Company as a result of the acts alleged herein.

**IX.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

(1)    Determining that this action is a proper derivative action maintainable under law and demand is excused;

(2)    Declaring that the Defendants named herein have breached their fiduciary duties, as alleged herein;

(3)    Requiring Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

(4)     Directing Defendants and Impax to take all necessary actions to ensure full compliance with all pertinent legal and regulatory obligations, and to protect the Company from a recurrence of the damaging events described herein;

(5)     Awarding to Plaintiff costs and disbursements of the action, including reasonable attorneys' fees, accountants', consultants', and experts' fees, and expenses; and

(6)     Granting such other and further relief as the Court deems just and proper.

**X.     JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all issues so triable.

DATED: November 11, 2014  **BERNSTEIN LITOWITZ BERGER**
           **& GROSSMANN LLP**


_____

Brett M. Middleton (Bar No. 199427)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Phone: (858) 793-0070
Fax: (858) 793-0323
brettm@blbglaw.com
    -and-
Mark Lebovitch
David L. Wales
Adam D. Hollander
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Phone: (212) 554-1400
Fax: (212) 554-1444
davidw@blbglaw.com
adam.hollander@blbglaw.com


Frank R. Schirripa
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
185 Madison Avenue
New York, NY 10016
Phone: (212) 213-8311
Fax: (212) 779-0028
fs@hachroselaw.com

*Attorneys for Plaintiff International Union of Operating Engineers Local 478*

# Pension Fund

International Union of Operating Engineers
Local Union 478 A-C-D-E

Management Trustees
Mario Smith
Timothy J. Arborio

Executive Director
Dorothy Siniscalchi

Union Trustees
Craig Metz
Garry W. Gyenizs

## VERIFICATION

We, the undersigned, are the Co-Chairmen of the Securities Litigation Sub-Committee of the International Union of Operating Engineers Local 478 Pension Fund ("Pension Fund"). This Sub-committee is authorized by the Pension Fund Board of Trustees to initiate the subject litigation and has determined in conjunction with the Board of Trustees that the Pension Fund should commence a shareholders derivative action against the Board of Directors of Impax Laboratories, Inc. We, on behalf of the Board of Trustees of the Pension Fund, hereby verify that we have authorized the filing of the attached Verified Shareholder Derivative Complaint, that we have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of our knowledge, information and belief.

The Pension Fund is a shareholder of the nominal defendant Impax Laboratories, Inc., a current owner of Impax common stock and has been an owner of such stock during the time period in which the wrongful conduct alleged and complained of in the Verified Shareholder Derivative Complaint occurred.

We declare under penalty of perjury that the foregoing is true and correct.

Signature _____     Signature _____

Name   Craig Metz, Labor Co-Chairman      Name   Timothy Arborio, Employer Co-Chairman

Date   11/6/2014                          Date   11/10/14